**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **John Doe I, and John Doe II,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **The Board of Education of The City of** | ) |
| **Chicago, Chicago Public Schools (CPS), CEO** | ) |
| **Janice Jackson, in her official Capacity, Laura** | ) |
| **Lemone, in her official capacity as Network** | ) |
| **Chief, District 14 of CPS Schools and former** | ) |
| **principal John Thuet, in his official capacity,** | ) |
| **and his individual capacity, Donovan** | ) |
| **Robinson, in his individual and official** | ) |
| **capacities, Pat Gordon, and Marcus Spencer,** | ) |
| **former basketball coaches in their individual** | ) |
| **and official capacities, and Camie Pratt, JD,** | ) |
| **Chief Title IX Officer, CPS Title IX** | ) |
| **Coordinator in her official capacity, and** | ) |
| **various CPS Employees** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

John Doe I and his father, John Doe II, bring the following complaint against Defendants

Chicago Public Schools, Janice Jackson, Laura Lemone, Donovan Robinson, Pat Gordon,

Marcus Spencer and Camie Pratt, and state as follows:

## STATEMENT OF THE NATURE OF THE CASE

1.    This case is brought to seek redress for retaliation for reporting an incident prohibited by

Title IX of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. § 1681, and the laws of

Illinois.    Additionally, claims of willful and wanton conduct associated with the various

defendants' failure to supervise and to conceal actions associated with sexual misconduct and its

1

reporting are also set forth below. Those failures have drastically and inalterably impacted John Doe I and another student, John Doe VI, incredibly creating a scenario where these two individuals who reported the misconduct became victims of a tired and broken system, forcing both to leave their teams and friends and the school entirely, and one to leave his family and move to another state to try and start over, all at critical stages of their emotional development and wreaking havoc with these critical times in their education and as student athletes.

2. John Doe I and his father John Doe II are not the only ones who recognize the victimization and damage that has been wrongly thrust upon them. Defendant CPS itself has admitted that the conduct engaged in by the administrators of Lincoln Park High School relative to Plaintiffs was wrong, dangerous, and reckless. CPS officials previously confirmed that the critical actions described in this complaint were "fully substantiated" and, in words of CPS spokesman Michael Passman: **"Administrators at Lincoln Park High School failed to promote the best interests of their students and endangered victims who were counting on their support."** (emphasis supplied). Plaintiffs' claims arise from these admitted failures and other actions by the Defendants.

## JURISDICTION AND VENUE

3. Jurisdiction is proper under 28 U.S.C. § 1331, which provides federal courts jurisdiction over all claims arising out of the Constitution, treaties and laws of the United States.

4. Jurisdiction over the Plaintiffs' state law claims is proper under 28 U.S.C § 1367 as they arise out of the same set of facts and circumstances as Plaintiffs' federal law claims.

5. Venue is proper under 28 U.S.C. § 1391(b)(1) as a substantial part of the events giving rise to the Plaintiffs' claim occurred in this judicial district.

## PARTIES

6.    This suit is brought pseudonymously to protect the identities of the students involved and their privacy. For further information, please see the concurrently or soon to be filed Motion to Proceed under Pseudonyms.

7.    Plaintiff John Doe I is a minor, former student of Lincoln Park High School (LPHS), and former basketball player for the Lincoln Park High School Basketball Team.

8.    Plaintiff John Doe I currently resides in Chicago, Illinois.

9.    Plaintiff John Doe II is an adult and John Doe I's father.

10.    Plaintiff John Doe II resides in Chicago, Illinois.

11.    Defendant The Board of Education of the City Of Chicago is a public entity and employer and former employer of multiple defendants in this case with offices at 1 N Dearborn Suite 950, Chicago, Illinois, 60602, which oversees Chicago Public Schools (CPS).

12.    Defendant Janice Jackson ("Jackson"), the Chief Executive Officer of CPS, and is being sued in her official and individual capacity for willful and wanton failure to supervise LaTanya McDade, Laura Lemone, John Thuet, Camie Pratt, and the staff of Lincoln Park High School and various CPS employees. Defendant Janice Jackson maintains offices at: 42 W. Madison Street, Chicago, Illinois, 60602.

13.    Defendant Latanya McDade ("McDade"), the Chief Education Officer of CPS, is being sued in her official and individual capacities for failure to supervise Laura Lemone, John Thuet, Camie Pratt, and the staff of Lincoln Park High School. Defendant Latanya McDade maintains offices at: 42 West Madison Street, 3rd Floor, Chicago, Illinois 60602.

14.     Defendant Laura Lemone ("Lemone") is being sued in her official capacity as Network Chief for District 14, the school district of Lincoln Park High School, and in her individual

capacity for willful and wanton failure to supervise John Thuet and the staff of Lincoln Park High School. As Network Chief, she had direct supervisory authority over John Thuet. Defendant Lemone maintains offices at: 110 N. Paulina, Chicago, Illinois, 60612.

15.    Defendant John Thuet is being sued in his individual capacity for willful and wanton misconduct relating to his deliberate indifference to the harassment of John Doe I and for concealment of information and reporting of sexual misconduct, and failure to supervise the basketball coaches and team.

16.    Defendant John Thuet ("Thuet") is a resident of Chicago, Illinois.

17.    Defendant Camie Pratt ("Pratt") is being sued in her official capacity as Chief Title IX Officer for CPS and in her individual capacity for a willful and wanton concealment of harassment against John Doe I and for failure to properly supervise the investigations of harassment against John Doe I due to his reporting of sexual misconduct.

18.    Defendant Camie Pratt maintains offices at 110 N. Paulina St, Chicago, IL 60612.

19.    Defendant Pat Gordon ("Gordon"), the former Lincoln Park High School boys' basketball coach, is being sued in his individual and official capacities for facilitating and encouraging harassment and retaliation against John Doe I.

20.    Defendant Donovan Robinson was the interim coach of the Lincoln Park High School Boys Basketball team, and he is being sued in his official and individual capacities for willful and wanton failure to supervise the basketball team, and retaliating against John Doe I and at the behest of former coach Gordon.

21.    Defendant Marcus Spencer ("Spencer"), a former volunteer coach of the Lincoln Park High School boys' basketball team, is being sued for defamation in his individual capacity for remarks made on a WGN Radio Show on February 4, 2020 about John Doe I and John Doe II.

4

## **FACTS COMMON TO ALL COUNTS**

The Roundball Classic Tournament.

22.     During the 2019-2020 school year, the Lincoln Park High School Varsity Basketball team (the "basketball team") was an elite team, ranked at the top of the Chicago Public School league as well as ranked near the top ten of high school teams within the entire state of Illinois. John Doe I was an important participant in the success of the team. This provided the student athletes with exposure to colleges, and from the Defendants' perspectives provided increased publicity and elevated the reputation, notoriety and name recognition of the school.

23.     On December 11, 2019, head basketball coach Pat Gordon ("Gordon") informed the basketball team that a planned trip to Florida for basketball tournament had been cancelled due to logistical issues.

24.     On December 12, 2019, Gordon informed the team they would instead play in the Motor City Roundball Classic in Detroit, Michigan, between December 27 and 29, 2019.

25.     Upon information and belief, Gordon submitted paperwork to CPS regarding the trip; but due to it being submitted late, it was not approved.

26.     Nonetheless, the Lincoln Park High School officials including John Thuet knew about and authorized the trip.

27.     The basketball team arrived in Detroit on December 27, 2019 and played games that day and the following day. Updates on the team and scores of the games were reported on the LPHS Basketball twitter feed, an account that claimed to be associated with the team.

28.     Copies of the tweets in question are attached as Exhibit A.

The Sexual Misconduct.

29. On the evening of December 28, 2019, there was sexual misconduct involving three boys affiliated with the basketball team (John Does III, IV, V) and a young woman affiliated with the team (Jane Doe).

30. A video was recorded of at least some part of this sexual misconduct. That video was shared amongst students on Instagram.

31. Also on the evening of December 28, 2019, John Doe I and his roommates failed to respond to a door check by Assistant Basketball Coach Pryce. At that time, Coach Pryce found that John Doe I was using an Xbox videogame system after lights out.

32. The following morning, two of the boys who engaged in sex acts with Jane Doe told members of the basketball team of their sexual contact with Jane Doe and bragged that Jane Doe did not know that John Doe IV and John Doe V had engaged in sexual activity with her.

33. At practice the following morning, John Doe I was informed that he had been suspended for two games for playing video games in his room after lights out.

34. Later that day during a car ride to a restaurant John Doe I informed his father, John Doe II and, the father of another student, referred to as John Doe VI (the student) and VII (the parent) respectively, of the above stated misconduct.

35. At the same time, Marcus Spencer ("Spencer") drove at least one of the individuals involved in the sexual misconduct to the same restaurant

36. During that drive, Spencer learned about the misconduct.

37. At the restaurant, Spencer stated to John Doe VII that students (referred to as "they" by Spencer) were involved in the sexual misconduct. Upon information and belief, it was known that those students referred to as "they" by Spencer were John Does III, IV, and V. Additionally,

Spencer did not report the incident and John Does III IV, and V had no suspension from any games.

Report of the Misconduct

38.   On December 30, 2019, John Doe II left a message reporting the sexual misconduct perpetrated against Jane Doe to CPS' Office of Student Protection (hereinafter "OSP").

39.   On December 31, 2020, John Doe VII emailed John Thuet, Interim Principal of Lincoln Park High School, on behalf of himself and John Doe II requesting a meeting about the sexual misconduct in Detroit.

40.   A copy of that email is attached as Exhibit B to the complaint.

41.   On January 2, 2020, John Doe VII and John Doe II met with Thuet to discuss the sexual misconduct in Detroit.

42.   At this meeting, Thuet informed John Doe VII and John Doe II that the Detroit trip was not a school authorized trip.

43.   Thuet informed John Doe VII and John Doe II that he had submitted his report to OSP on January 3, 2020 by email, but indicated he might not be able to keep the report anonymous.

44.   A copy of that email is attached as Exhibit C to this Complaint.

45.   The following week, OSP began an investigation into the sexual misconduct.

46.   John Does I and VI were interviewed by OSP.  OSP did not notify their parents of the time or place for the interview, nor provide them with an option of appearing in person with their minor child in such a stressful circumstances. Instead, their parents were on the phone during their interviews.

47.   On January 9, 2020, Thuet sent a letter informing parents of basketball team members that the basketball team had taken an unauthorized trip to Detroit, the staff person who organized

the trip had been removed from his position, and Donovan Robinson would be named interim coach of the basketball team.

48. A copy of that letter is attached as Exhibit D to the Complaint.

49. Although not identified by name, the removed individual was Gordon.

50. Despite being removed from his position, Gordon continued to communicate with the basketball team by text message as well as with other Lincoln Park administration.

51. John Doe VII and John Doe II informed Thuet of these text messages via email on January 13, 2020.

52. A copy of the email sent and text messages are attached as Exhibit E to this complaint.

Harassment and Retaliation.

53. At some point prior to January 8, 2020, Gordon revealed to one or more of the basketball team members that John Doe I and John Doe VI revealed the sexual misconduct to OSP.  Gordon and others told the basketball team to deny the allegations and not to cooperate with the investigation.  Other Lincoln Park basketball coaches were present as well, and expressly and/or impliedly ratified the actions and directives of Gordon who (i) placed John Doe I as the central focus of hate and harassment for having been the whistleblower associated with sexual misconduct, and (ii) directed that the incident of sexual misconduct on the trip, be lied about in discussions with authorities so that the misconduct could be covered up.

54. On January 8, 2020, John Doe II texted Thuet informing him that someone, later revealed to him to be Gordon, had disclosed to the team that John Doe I had reported the misconduct.

55. About January 8, 2020, John Doe I began receiving threatening messages from basketball team members who had engaged in the sexual misconduct, a direct result of the actions of the

Lincoln Park basketball staff. For example, the brother of John Doe V sent a threatening message to John Doe I via social media.

56.     A copy of that message is attached as Exhibit F to this Complaint.

57.     The entire Lincoln Park coaching staff was aware of the threatening messages, which at a minimum placed Lincoln Park's administrators (including but not limited to Defendant Thuet) and CPS on notice.

58.     Subsequently, John Doe I did not play in any games for which he was available after he reported the sexual misconduct, despite playing significant minutes in every game prior to the unauthorized Detroit trip.

59.     On January 9, 2020, John Doe II also texted Thuet about violence threatened against John Doe I by John Doe III, and the potential for a violent altercation.

60.     Copies of texts between John Doe II and John Thuet are attached as Exhibit G to this complaint.

61.     On January 10, 2020, John Doe II emailed Thuet copies of threats received by John Doe I and met with Thuet and Robinson.

62.     A copy of that email is attached Exhibit H to this Complaint.

63.     On January 10, 2020 Robinson informed the team that John Does I and VI had reported the sexual misconduct.

64.     Also on January 10, 2020, Robinson allowed John Doe III to call John Doe I a snitch in front of the whole basketball team, further exacerbating the hostility towards him and the emotional trauma that he was suffering from this incident.

65.     Shortly after John Doe III called John Doe I a snitch, he challenged John Doe I to a fight.

66. Despite having this information, Thuet took no action against the threats. To the contrary, Thuet and others allowed the adult brother of John Doe III – who was actively threatening John Doe I – on to CPS property, and took no steps to protect John Doe I from physical and emotional harm.

67. Upon information and belief, OSP learned that there was student-on-student retaliation and harassment on January 10, 2020 or at latest, January 16, 2020.

CPS Response to the Harassment.

68. As John Doe II and John Doe VII grew increasingly alarmed about the toxic nature of the basketball team and the impact on John Does I and VI of the manner in which the issues that arose during the Detroit trip were being addressed, they arranged a call with Thuet on January 17, 2020.

69. During their call with Thuet, John Doe II and John Doe VII discussed with Thuet the threats that John Does I and VI received, as well as the harassment directed towards them.

70. John Doe II also informed Thuet that as a result of the harassment and its impact on John Doe I, he was considering transferring John Doe I.

71. Although Thuet was fully informed of the retaliation against and harassment of John Does I and VI, Thuet declined to take any specific action, including any action in opposition to the reduction in playing time, and downplayed the retaliation and harassment in reporting to OSP thereby condoning the retaliation and harassment and allowing it to continue and leaving John Does I and VI to further be victimized and traumatized from the reporting of the incident of sexual misconduct.

72. In a January 21, 2020 follow-up email, John Doe VII informed Thuet that he would be reaching out to OSP regarding this harassment.

10

73.    A copy of that email is attached as Exhibit I to this complaint.

74.    January 21, 2020, John Doe VII sent an email to Aneita Williams, CPS Title IX Officer of Sports ("Williams") regarding the harassment discussed with Thuet.

75.    A copy of that email is attached as Exhibit J to the Complaint.

76.    Williams responded on January 22, 2020 that the OSP would be looking into the harassment against John Does I and VI.

77.    About a week later, after receiving no response from OSP, John Doe II emailed Janice Jackson, the Chief Executive Officer of Chicago Public Schools ("Jackson"), informing her about the harassment that John Does I and VII were facing.

78.    A copy of the email is attached as Exhibit K to this complaint.

79.    In response, John Doe II received a phone call from Latanya McDade, the Chief Education Officer of CPS ("McDade").

80.    On January 30, 2020, OSP investigators met with John Doe II and John Doe VII and then offered John Doe I an option to transfer for his safety.

81.    At that time, via email and letter, OSP informed John Doe VII and John Doe II that they were opening an investigation into the harassment and retaliation against John Does I and VI.

82.    Copies of the letters and emails are attached as Exhibit L to this Complaint.

83.    On January 31, 2020, Robinson was suspended and Thuet and Michelle Brumfield, the Assistant Principal at LPHS, were removed from their positions for allegedly downplaying allegations of retaliation and harassment.

84.    Also on January 31, 2020, the Lincoln Park boys' basketball season was cancelled.

85. On February 3, 2020, CPS held a community meeting in which basic details were given as to the investigations into harassment and misconduct and revealed that there were four ongoing investigations.

86. Thereafter, the verbal harassment against John Does I and VI continued to escalate, and an online petition began to circulate to allow the boys' basketball season to resume.

The John Williams Show.

87. On February 4, 2020, Spencer appeared on the John Williams Show on WGN Radio with his attorney Richard Lenkov and a member of the basketball team.

88. On air, Spencer stated that CPS knew of the trip to Detroit for the Motor City Roundball Classic Tournament, but did not approve of it because of paperwork being filed late.

89. Spencer denied having knowledge of any sexual misconduct on the trip.

90. Spencer further denied that harassment had taken place.

91. In denying the harassment had taken place, Spencer stated that CPS had only heard one side of the story.

92. He further stated, "They interviewed someone who wasn't happy, and that person needed an opportunity to get away, and they used this as a platform to victimize themselves, and to put the program in a bad light in order to give themselves the opportunity to go or play somewhere else."

93. Spencer also stated that John Doe II had threatened the coaching staff repeatedly since late November 2018.

Effects of the Harassment.

94. John Doe I's grades dropped from passing to failing due to the harassment. Second semester, John Doe I had low D's. John Doe I made efforts to discuss the issues with teachers

and administrators, stating that the situation was impacting his ability to deal with class, but those pleas for help were ignored.

95.    After it was revealed on January 10, 2020 that it was John Doe I who reported the harassment, members of the basketball team and other students stopped talking to him and subjected himto extreme mental anguish.

96.    On January 29, 2020, with the harassment intensifying and anguish growing, John Doe I was forced to withdraw from Lincoln Park.  John Doe I left the state of Illinois completely, and transferred to a new school in Texas.

97.    John Doe I has since returned to Illinois, and will repeat his junior year.

98.    On June 23, 2020, Laura Lemone, Network Chief for District 14 ("Lemone"), released a letter to the Lincoln Park High School Community as a status update on the coaches that were removed from their position.

99.    A copy of that letter is attached to Exhibit M to the Complaint.

100.  On February 13, CPS indicated that the information shared on February 3, 2020 had been fully substantiated by an email.

101.  A copy of that email is attached as Exhibit N to the Complaint.

102.  In both letters, Lemone and McDade indicated that CPS had substantiated multiple allegations of serious misconduct and admitted that such misconduct created significant and severe harm on individuals such as John Does I and VI.

103.  Further, given the serious misconduct, in the June 23, 2020 letter, Lemone indicated CPS would be proceeding with a termination hearing against Gordon, and indicated that Robinson and Larry Washington would return to their positions and receive training from the Network and OSP moving forward.

104.  Additionally, in a letter dated February 7, 2020, but received on April 28, 2020 CPS confirmed that allegations of retaliation involving John Doe I were substantiated

105.  A copy of that letter is attached as Exhibit O to the Complaint.

## FIRST CLAIM
## AGAINST THE BOARD OF EDUCATION OF THE CITY OF CHICAGO
## TITLE IX RETALIATION

106.  Plaintiffs reallege and reincorporate the facts alleged in paragraph 1-105, as if they were set forth here.

107.  John Doe I engaged in a protected activity under Title IX when he reported the sexual misconduct to CPS employees directly and through his father, John Doe II.

108.  As a result of reporting the sexual misconduct, CPS employees and agents retaliated against John Doe I  by taking adverse action against him in one or more of the following ways:

   a.  Robinson took away from John Doe I, all playing time such that John Doe I did not receive playing time in games for the remainder of the season despite being a previously dependable bench player with significant game time;

   b.  Gordon, Robinson and other coaching staff condoned and even encouraged the harassment of John Doe I, as well as the concealment of the sexual misconduct which John Doe I reported;

   c.  Thuet actively concealed from his superiors and/or otherwise condoned the harassment and retaliation of John Doe I by coaching staff and students;

   d.  Officials at CPS continued to downplay and avoid investigation until prompted by the actions of John Does II and VII.

109.  The acts of retaliation created significant pressure and emotional trauma on John Doe I.

110. Furthermore, the loss of playing time and premature end of Lincoln Park's basketball season resulted in significant loss of exposure and damage to the future basketball prospects of John Doe I.

111. Under these circumstances, and without coach advocacy, John Doe I's college scholarship prospects are significantly diminished.

112. The actions of concealment by the coaching staff and administration, and the harassment by other basketball team members and LPHS students, resulted in significant mental anguish to John Doe I. For John Doe I, that led to his moving to Texas, and then moving back to Illinois, damaging his scholastic career, and requiring him to be delayed in completing his education.

113. The Board of Education of the City of Chicago had supervisory authority over the administrative defendants at all relevant times.

WHEREFORE, Plaintiff John Doe I demands judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

**SECOND CLAIM**
**AGAINST THUET**
**WILLFUL AND WANTON**
**FAILURE TO PROTECT**

114. Plaintiffs reallege and reincorporate the facts alleged in paragraph 1-105, as if they were set forth here.

115. Thuet was informed by John Doe II and John Doe VII of the harassment of John Does I and VI by other LPHS basketball team members and LPHS students and the retaliatory actions taken against John Does I and VI by LPHS basketball coaches, including Gordon and Robinson.

116. Thuet had actual knowledge of the harassment and threats against John Does I and VI, yet did not follow procedures as required by CPS policy relating to the harassment and bullying.

15

117.  Per CPS anti-bullying policy, the principal is required to inform OSP of any Title IX related harassment:

> The Principal or his/her designee will provide immediate support to any targeted student(s) to ensure safety. If there are overt or implied risks of safety, follow the steps in the CPS Crisis Manual, including immediately notifying the CPS Student Safety Center and the school's Network office. Alleged behaviors targeted at sex, gender, sexual orientation, gender identity, or gender expression should be reported immediately to the Office of Student Protections and Title IX for assistance and support at the OSP Hotline: (773) 535-4400.

118.  A copy of the bullying policy is attached as Exhibit P to the Complaint.

119.  Thuet either failed to report the information he had and/or intentionally downplayed the retaliation and harassment and omitted details when reporting to OSP and his supervisors.

120.  Thuet also failed to intervene in the increasingly toxic environment of the basketball team, including physical threats, harassment and retaliation from students and coaches, and leaking of the identities of John Doe I and VI as described in the prior paragraphs of this complaint.

121.  Thuet was motivated to protect the LPHS basketball team because of its great success.

122.  Defendant Thuet's failure to intervene and report the harassment constitutes wanton and willful misconduct, as he showed an utter disregard for the safety of John Does I and VI.

123.  As a result, no action was taken to support or protect John Does I and VI, nor was there any substantial investigation into the harassment until John Doe II and John Doe VII escalated the complaints on January 21, 2020, and January 29, 2020.

124.  Due to this delay, the harassment and retaliation continued until the season was forced to be cancelled, and resulted in a toxic environment that destroyed the school year for John Doe I and forced him to leave the school entirely.

16

125. As a proximate result of Thuet's actions, John Doe I suffered in significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff John Doe I demands judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

### THIRD CLAIM
### AS TO GORDON
### WILLFUL AND WANTON
### FAILURE TO PROTECT

126. Plaintiffs' reallege and reincorporate the facts alleged in Paragraphs 1-105.

127. At all relevant times, Gordon was an employee of CPS.

128. Gordon leaked the identity of John Does I and VI as whistleblowers to Robinson and members of the basketball team knowing that such individuals would retaliate against them.

129. Further, Gordon gave direction to Robinson to retaliate against John Doe I by, among other means, eliminating his playing time.

130. These actions of Gordon demonstrate an utter disregard or deliberate indifference to safety of John Doe I.

131. As a proximate result of Gordon's actions, John Doe I suffered significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff John Doe I demands judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

**FOURTH CLAIM**
**AS TO ROBINSON**
**WILLFUL AND WANTON**
**FAILURE TO PROTECT**

132. Plaintiffs' reallege and reincorporate the facts alleged in Paragraphs 1-105

133. At all relevant times, Robinson was an employee of CPS.

134. Robinson revealed the identity of John Does I and VI, as whistleblowers to members of the basketball team knowing that such individuals would retaliate against John Does I and VI.

135. Robinson further placed John Does I and VI in dangerous situations including, but not limited to, leaving them unsupervised with John Doe III aware that a physical altercation was likely.

136. Robinson also retaliated against John Doe I by, among other means, eliminating his playing time.

137. Defendant Robinson's retaliation against John Doe I and the revealing of the identities of John Does I and VI, and the leaving unsupervised John Doe I and one of the team members that engaged in sexual misconduct on the boys' basketball team trip to Detroit, constitutes willful and wanton disregard for the safety of John Doe I.

138. As a proximate result of Robinson's actions, John Doe I suffered significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff John Doe I demands judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

**FIFTH CLAIM**
**AS TO LEMONE, MCDADE, PRATT AND JACKSON**
**WILLFUL AND WANTON**

18

## CONCEALMENT

139. Plaintiffs reallege and reincorporate the facts alleged in Paragraphs 1-105

140. Upon information and belief, Thuet forwarded texts and emails related to harassment against John Does I and VI to his network chiefs and OSP as of January 10, 2020.

141. Alternatively, OSP and School Leadership, including Defendants Lemone, McDade, Pratt, and Jackson learned of the retaliation and harassment not later than January 16, 2020.

142. In spite of this knowledge, OSP did not open an investigation until not earlier than January 22, 2020 or as late January 30, 2020, after prompting from both John Doe II, and John Doe VII.

143. By failing to open an investigation into known harassment, CPS demonstrated willful and wanton misconduct, only corrected because of the persistence of John Doe II and John Doe VII.

144. Their delay resulted in escalating harassment and threats against John Doe I, which CPS admitted was imposed upon John Doe I, and led eventually to his withdrawal from the school and the City.

145. As a proximate result of the acts and omissions of Lemone, McDade, Pratt, and Jackson actions, John Doe I suffered significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff John Doe I demands judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

### SIXTH CLAIM
### AS TO THUET, LEMONE, MCDADE, PRATT AND JACKSON
### WILLFUL AND WANTON
### FAILURE TO SUPERVISE

146. Plaintiffs reallege the facts as set forth in Paragraphs 1-105

147. Despite knowing of opening an investigation into sexual assault, reported by student whistleblowers, Thuet, Lemone McDade, Pratt and Jackson took no action to prevent the leaking of the identities of said whistle blowers.

148. Thuet in fact notified John Doe II and John Doe VII that he did not think that OSP would keep the report or any of their identities anonymous.

149. Upon information and belief, none of the defendants' above took any action to prevent any sort of leaking by adult CPS employees of John Does I and VI's identities.

150. This situation was volatile and traumatic, as evidenced by the removal of coaches on the trip, yet CPS chose to do nothing to protect the identities of John Does I and VI who reported the misconduct. CPS knew that the reports were significant in nature yet stated keeping them anonymous would be impossible.

151. Furthermore, the Defendants did nothing to ensure that those working with the basketball team were properly trained to ensure student safety. For example, there were no background checks on volunteers for the basketball team. There was no supervision regarding trips to tournaments and the like to ensure that all proper paperwork and approvals were provided. And, there was a failure to train and supervise personnel to ensure that rather than deny and conceal incidents of sexual misconduct, there would be steps taken to protect victims and work with professionals for assistance with such misconduct where such misconduct would be reported and those reporting such misconduct protected.

152. Their deliberate inaction was a choice that demonstrated a conscious disregard or deliberate indifference to the safety of John Doe I . CPS admitted that the circumstances left the students unprotected and subject to trauma.

153.  As a proximate result of the acts and omission of Thuet, Lemone, McDade, Pratt, and Jackson, John Doe I suffered significant mental anguish, losses of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff John Doe I demands judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

## SIXTH CLAIM
## AS TO THE BOARD OF EDUCATION OF THE CITY OF CHICAGO
## INDEMNIFICATION

154.  Plaintiffs reallege the facts as set forth in Paragraphs 1-153.

155.  At all relevant times, Thuet, Gordon, Robinson, Lemone, McDade, Pratt and Jackson were employees CPS acting in their official capacity.

156.  Illinois law, 745 ILCS 10/9-102, provides that  the Board of Education of the City of Chicago by way of CPS is directed to pay any tort judgment for compensatory damages entered against its employees acting in their official capacity.

WHEREFORE, Plaintiff John Doe I demands judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

## SEVENTH CLAIM
## AS TO SPENCER
## DEFAMATION

157.  Plaintiffs reallege and reincorporate the facts alleged in Paragraphs 1-105.

158.  As noted above, Spencer appeared on a radio show on February 4, 2020.

159.  On that show, he indicated that John Doe I had made up the reports of misconduct, and harassment and retaliation, and wanted to victimize himself, and paint the program in a bad light.

160. Spencer had explicit knowledge of the misconduct, having been told about it and potentially having watched a video.

161. Defendant Spencer also indicated that John Doe II had threatened the coaching staff from November 2018 onward.

162. These statements are false.

163. Defendant Spencer is an extremely well connected basketball coach in the AAU circuits.

164. His AAU teams, and his Sonny Parker Foundation are key pieces of the AAU circuit in Chicago, and he is well connected nationally.

165. His remarks have made it impossible for John Doe I to play basketball in the AAU Circuit in Illinois.

166. This causes significant damage to John Doe 1 including a loss of opportunity as the Illinois AAU circuit is a major circuit.

167. Because of Spencer's false remarks, John Doe I has lost significant opportunities in basketball, and has had academic issues that require that he repeat his junior year, creating significant additional roadblocks and emotional trauma.

168. John Doe I's family will also be unable to support his basketball endeavors, because of Spencer stating that John Doe II threatened coaches for several months.

169. Such statements have further strained the relationship between John Doe I and his family, and creates further emotional trauma at this time.

170. Spencer had actual knowledge of the falsity of these statements, or alternatively, recklessly disregarded the possibility that the statements are false.

WHEREFORE, Plaintiffs John Doe I and John Doe II demand judgment in an amount in excess of $150,000 as and for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims for which a trial by jury would be available.

Respectfully Submitted

/s/ Thomas G. Gardiner

Attorneys for Plaintiffs

Thomas G. Gardiner (Ill. Bar 6180243)
John R. Wrona
Gardiner Koch Weisberg & Wrona
53 West Jackson Blvd., Suite 950
Chicago, Illinois 60604
P 312-362-0000
F 312-362-0440
tgardiner@gkwwlaw.com
jwrona@gkwwlaw.com

Michael Rachlis
RACHLIS DUFF & PEEL, LLC
542 South Dearborn, Suite 900
Chicago, Illinois 60605
P. 312-733-3950
F. 312-733-3952
mrachlis@rdaplaw.net



EXHIBIT A



I would be happy to meet with you as soon as possible. Please let me know of your availability on Thursday morning. Thank you.

John Thuet
Interim Principal
Lincoln Park High School

On Tue, Dec 31, 2019, 1:43 PM ███████████████████████████ wrote:

Mr. Thuet,


I hope you are enjoying the holiday season. I'm the father of ███████████ a junior at Lincoln Park High School. I, along with ██████████ (copied here), would like to meet with at earliest convenience regarding a very serious matter. █████████ is the father of ████████████ also a junior at Lincoln Park.


Please let us know you availability as soon as possible.


Thanks.

EXHIBIT B

EXHIBIT B



**Subject:**                    Re: Meeting Request


Just to update you both, I completed my report to OSP, so the investigation is now in their hands. While I kept your report anonymous, they did say that they are unsure if this will be possible and may need to follow up with you, so I will let you know if I hear anything else. I am also in the process of working with CPS on the adult issues involved. I doubt that I will be able to share specifics beyond that, but I want to assure you that we are taking appropriate steps. Thanks,


**John Thuet**
Interim Principal, Lincoln Park High School
2001 N Orchard St, Chicago, IL 60614
773.534.8130 Main | 773.534.8218 Fax
lincolnparkhs.org



On Thu, Jan 2, 2020 at 9:35 AM ███████████████████████████ wrote:
 No worries. We are here.


        On Jan 2, 2020, at 9:30 AM, Thuet, John <jrthuet@cps.edu> wrote:


        I went to the wrong Starbucks. I'll be a few minutes late.

        John Thuet
        Interim Principal
        Lincoln Park High School

        On Wed, Jan 1, 2020, 12:57 AM ██████████████████████ wrote:
        Mr. Thuet,
        Due to obvious reasons, I think it is in the best interest of our sons to meet off campus. If you
        are agreeable we would like to meet at 9:30 at Starbucks located at 2200 N Halsted.

        ██████ and I don't want to expose our sons to any fallout, especially seeing that an
        assistant coach called me a few hours after I spoke with you. I'm sure you can understand our
        position.

        Thanks again for your time,

        ██████

        Sent from my iPhone

EXHIBIT C

On Dec 31, 2019, at 2:38 PM, Thuet, John <<u>jrthuet@cps.edu</u>> wrote:

Hello ███████████

I would be happy to meet with you as soon as possible. Please let me know of your availability on Thursday morning. Thank you.

John Thuet
Interim Principal
Lincoln Park High School

On Tue, Dec 31, 2019, 1:43 PM ███████████
███████████████████ wrote:

Mr. Thuet,


I hope you are enjoying the holiday season.  I'm the father of ████████████, a junior at Lincoln Park High School.  I, along with ██████████ (copied here), would like to meet with at earliest convenience regarding a very serious matter.  ████████ is the father of █████████████ also a junior at Lincoln Park.


Please let us know you availability as soon as possible.


Thanks.


██████████


████████████

█████████████

██████████████████████

███████████████████

█████████████

2

EXHIBIT C



EXHIBIT C



**LINCOLN PARK HIGH SCHOOL**
2001 N. Orchard St.
Chicago, IL 60614
P: 773-534-8130
F: 773-534-8218

WWW.LINCOLNPARKHS.ORG

**John Thuet**
*Interim Principal*

**Elizabeth Brown**
*Assistant Principal*

**Kenneth Duncan**
*Assistant Principal*

**Michelle Brumfield**
*Assistant Principal*

Dear Lincoln Park High School Boys Basketball Team Parents and Families,

The safety of your children is always our top priority, which is why I must inform you of a situation that has recently come to light. I've been made aware that members of the boys basketball team took an overnight trip over winter break that was not a school sponsored event. The staff member who led the trip has been removed from the school, and the district is investigating this situation in accordance with CPS policy.

Please know that we are taking this situation seriously, and we remain committed to providing your children with a safe, positive learning environment where they can reach their full potential. While I am unable to discuss details regarding the investigation, I am always available to discuss steps the district takes to keep students safe and matters related to your child. I can be reached at (773) 534-8130 or jrthuet@cps.edu.

Sincerely,
Principal Thuet



EXHIBIT D

**Subject:** RE: Basketball Team Update 1-9
**Attachments:** Lincoln P.jpg

John,

I'm writing to inform you that Pat Gordon is still communicating with the team via text messages. He's also communicating with the parents as well. It's my understanding that he has been removed as the coach, but it is clear that he is still very much coaching and calling the shots. See the attached text message.

Also, there are cameras in the hotel hallways and lobby.

Please let me know if you'd like to discuss.

**From:** Thuet, John <jrthuet@cps.edu>
**Sent:** Thursday, January 9, 2020 1:31 PM
**To:**
**Subject:** Fwd: Basketball Team Update 1-9

Hi

I don't believe your emails were on my original list. This was sent to basketball families earlier today. I hope it helps. Thanks,

**John Thuet**
Interim Principal, Lincoln Park High School
2001 N Orchard St, Chicago, IL 60614
773.534.8130 Main | 773.534.8218 Fax
lincolnparkhs.org

---------- Forwarded message ---------
**From: Thuet, John** <jrthuet@cps.edu>
Date: Thu, Jan 9, 2020 at 12:22 PM
Subject: Basketball Team Update 1-9
To: John Thuet <jrthuet@cps.edu>

Hello Basketball Families,

Please review the attached letter about the coaching change that occurred yesterday.

EXHIBIT E

For the immediate time, Donavan Robinson who has helped out with the program in the past and is a long time CPS employee will take over as interim head coach.

Thanks,


**John Thuet**
Interim Principal, Lincoln Park High School
2001 N Orchard St, Chicago, IL 60614
773.534.8130 Main | 773.534.8218 Fax
lincolnparkhs.org

EXHIBIT E




**3:20**

< 78

+1 (678) 430-8476 >

by the weightroom business as usual, captains I need you to stepup and lead Stretch and Core

**Friday** 3:27 PM

Lincoln Park Varsi: You guys will meet Coach Robinson @ 430 in room 206

Good Luck tonight stay locked in

Beat Down The Indians
-
Text back to reply

**Today** 2:57 PM

Lincoln Park Varsi: Good Afternoon, though the hearing went well this morning, no decision will be made til tomorrow,

You will meet Coach Ott by the weightroom

  Text Message 

       

EXHIBIT E - PART 2



EXHIBIT F



3:33
◀ Messages

Y'all Garbage asl ain't on shit do something maybe you can play

We never needed y'all hear should have stayed y'all ass in ███████h that's facts I got words for both y'all parents

u dumb asf if you and yo brother think i snitched

nigga i never been a hater.

fym

i supported ███ when niggas was hating on him

Man all y'all Clowned out ███it could get like that

You one of the niggas hating though

you dumb asl i never hated on ish

Boy your brother better be really about that

💯

███it's that

💯


EXHIBIT F



EXHIBIT G





That's really frustrating. I was explicit with both of them. Are they still with the team?

I will follow up with OSP.

No but ███████ addressed the team..... and he's standing with them. Clearly they don't have to comply. The only coach not here is ████ This is ridiculous.....

Wed, Jan 8, 7:50 PM

Yes it is. I've contacted the CPS legal team. I'm very sorry that this is happening.

I'll be making some calls as well..... ████ instructed the staff not to play my son. He's being singled out and retaliated against for doing the right thing. Coach ████ states that ████ told him not to play ████████

Wed, Jan 8, 9:40 PM





12:45

103

Good evening as some of you may have heard I have been suspended until a hearing monday morning in regards to an investigation from our Trip to Detroit

In the meantime I cannot coach the next couple of games, I will keep you guys posted on any Developments , as I plan to appeal the suspension tomorrow morning

sent this to parents and students.....

Thanks for the heads up. I'm still waiting on legal and hope to send something in the morning.

Thu, Jan 9, 1:37 PM

I received the letter and read the article in the Sun Times. Very interesting Coach is referencing a parent that wasn't there.....







12:46

**103**

I know u got a lot going on....... I also know this situation is crazy and it's probably hell to deal with. I appreciate u dealing with me through this.

They don't want me to share the text thread with you. If u want to see I will send it. If not I will keep it.

Fri, Jan 10, 8:45 AM

Thanks for the support. Do whatever you feel comfortable with. I pass any information I receive to OSP.

Fri, Jan 10, 12:02 PM

If any of the text messages are threats against any players (including your son), we need to know about them to address them specifically. Please let me know.

They are coming via email





**12:46**

**104**

Thank you.

Tue, Jan 14, 4:02 PM

My son just got into a fight I need to speak to u asasp

Sun, Jan 26, 4:31 PM

Unfortunately Mr. Thuet I will be withdrawing ▓▓▓▓ from Lincoln Park. The threats are taking too large of a toll on him. There were more Friday. For the benefit of the kids and adults that are doing this to him .... I choose to step away and protect him before these issues force a resolution that would not be reflect a healthy conclusion.

I will be in between Monday-Wednesday. Please have paperwork ready and a letter of recommendation for him. Thank u in advance

Wed, Jan 29, 11:43 AM







12:47

‹ 104

████████ was scared that if they fought he could get arrested/ or the boy would call gang members up to the school to jump him. He's dejected and feels horrible about ever saying anything.

Wed, Jan 29, 2:45 PM

Did we render a decision about his grades/final and good standing letter? I need a letter from you with contact so new school can understand the circumstances. They are asking. Thanks

I've been working on this with my network so I apologize for the delay. There are policies that I do not believe allow us to excuse finals taken in person. I responded to your email a few moments ago. I would be happy to help you with ████ transfer. There is a good standing form that we traditionally use. I will



Text Message



school can understand the circumstances. They are asking. Thanks

I've been working on this with my network so I apologize for the delay. There are policies that I do not believe allow us to excuse finals taken in person. I responded to your email a few moments ago. I would be happy to help you with ▮▮▮ transfer. There is a good standing form that we traditionally use. I will complete and sign that and have it ready for you.

Thanks

Can u email it or do I have to come get it?

I can scan and email it. It is just a form, so if you need something more specific, it may take a minute.

Ok I'll read it



██████████

██            ████████████████
█             ███████████
**Subject:**              Fwd: ███ threats

Sent from my iPhone

Begin forwarded message:

> **From:** ████████████████
> **Date:** January 10, 2020 at 12:08:01 PM CST
> **To:** John Thuet <jrthuet@cps.edu>
> **Subject:** █████████████

> Communication between ████████████

EXHIBIT H



**T-Mobile Wi-Fi** 🛜    3:02 PM

◀ 114

[REDACTED] got together and told his dad that told the school [REDACTED]

How do you

That's why I said don't say nothing. I'm not blaming u but you needa be aware of who tf you tell and ur relationships with mfs

2

EXHIBIT H

Sent from my iPhone

Communication between █████████████████

EXHIBIT H



4

EXHIBIT H

Communication between ███████████████

EXHIBIT H

3:26 ⏺

< 5

DEC 6, 3:42 PM

aye bring da 20$ i

3:16 PM

Aye whatever y'all got going on with parents plotting on my lil bro y'all sick

Y'all Garbage asl ain't on shit do something maybe you can play

 We never needed y'all hear should have stayed y'all ass in ████ n that's facts I got words for both y'all parents

u dumb asf if you and yo brother snitched

nigga i never been a

6

EXHIBIT H

Convo continued:

EXHIBIT H



3:33 ◀︎

◀ Messages

Y'all Garbage asl ain't on shit do something maybe you can play

We never needed y'all hear should have stayed y'all ass in ███ n that's facts I got words for both y'all parents

u dumb asf if you and yo brother snitched

nigga i never been a

i supported ██ when niggas was hat him



Man all y'all Clowned out ██ it could get like that

8

EXHIBIT H

This is what I shared with Donovan in your office......

EXHIBIT H

████████

| | |
|---|---|
| **From:** | ████████ |
| **Sent:** | Tuesday, January 21, 2020 11:51 AM |
| **To:** | Thuet, John |
| **Cc:** | ████████████ |
| **Subject:** | Follow Up To Friday's Call |
| **Attachments:** | IMG_3521.PNG; IMG_3518.PNG; IMG_3522.PNG; IMG_3519.PNG |

John,

Thanks for the call on Friday with me and ████ Per our discussion, I wanted to follow up regarding the current members of the coaching staff for the boys varsity basketball team at Lincoln Park. Can you please provide the names of those individuals? Further, attached are several concerning text messages. I believe you received these text messages from ████████████ sometime ago. Below is a description of the text messages:

1. IMG_3521 - A text exchange between ████████████ In this text, ████████████ told their parents what happened and ████ not mad at him about it.
2. IMG_3518 and IMG_3522 – Threatening text exchanges between ████████ on the team group chat.
3. IMG_3519 – A threatening social media exchange between ████████████ to

Also as discussed Friday, ████ is seriously considering transferring ████ out of the school as a result of the threats, retaliation and overall toxic environment at Lincoln Park. It is my understanding that Donavan Robinson, the interim head coach, is the one that told the coaching staff and team that it was ████ that did the right thing and told his parents. Donovan told ████ as much. The retaliation against ████████ is continuing. ████ went from a starter all season to receiving no playing time at all.

From our conversations, I understand you are unable to do anything further about this situation. As a result, I will be reaching out to others at CPS and IHSA regarding this issue.

Thanks.

████

████████████

EXHIBIT I



them

Naw ain't goofy mf watch yo mf cuz u mf fucking get hurt out here fucking with me

Like that shit ain't cool and u wanna play we can

but go off shorty oml im not ducking no smoke. i told u ain say shit that's that 💯

u not finna hurt shit boaaa

Yea lte we'll see

Yea ok

aye chill tf out bro

we got a whole rivalry game tomorrow g

tb sydni heard something. boa u dumb asl



stayed y'all ass in ▮ n that's facts I got words for both y'all parents

u dumb asf if you and yo brother think i snitched

nigga i never been a hater.

fym

i supported ish when niggas was hating on him

Man all y'all Clowned out ▮ it could get like that

You one of the niggas hating though

you dumb asl i never hated on

💯

Boy your brother better be really about that

Oms it's that

boa u outa be goofy asf to believe

them

Naw ain't goofy mf watch yo mf cuz u mf fucking get hurt out here fucking with me

Like that shit ain't cool and u wanna play we can

but go off shorty oml im not ducking no smoke. i told u ain say shit that's that 💯

u not finna hurt shit boaaa

chill out

Yea lte we'll see

Yea ok

aye chill tf out bro

got together and told his dad that told the school

How do you know

That's why I said don't say nothing. I'm not blaming u but you needa be aware of who tf you tell and ur relationships with mfs

How do U know they said sum

How do u know

Delivered

she she heard something about them saying shit to get u get under more investigation

And ___ is the one going



**From:** Williams, Aneita <amwilliams65@cps.edu>
**Sent:** Wednesday, January 22, 2020 12:23 PM
**To:** ████████████████████████████████
**Cc:** Rodriguez, Aimee <arodriguez651@cps.edu>; Debra Spraggins <dspraggins7@cps.edu>
**Subject:** Re: Title IX Violation to Original Complaint

Good afternoon ████████

Thank you for notifying me of the situation. This email acknowledges that the Office of Student Protections and Title IX (OSP) received your **complaint of retaliation against student athletes on the Lincoln Park Boys Basketball team**.

Our office takes these matters seriously and will look into the issue you identified in your email. The signature line of your email includes office contact information, however would you like to provide an additional phone number (cell or home) where you can be reached? We will be contacting you to discuss the issue in further detail prior to our investigation.

I am copying my manager, Aimee Rodriguez, Director of Title IX Compliance & Training and Debra Spraggins, Director of Investigations on this communication. If you have any questions or concerns in the meantime, feel free to reach out to me directly. My contact information is below. You may also contact Aimee at arodriguez651@cps.edu, (773) 535-4528.

Thank you for your cooperation.

On Tue, Jan 21, 2020 at 3:33 PM ████████████████████████ wrote:

> Aneita,
>
> I'm writing to inform you there has been retaliation against a couple of students-athletes on the Lincoln Park Basketball team regarding the incident that occurred on the unauthorized trip to Detroit. There have been threatening texting messages between the students. In addition, there have been text messages between some students and adult siblings of students involved.
>
> Please let me know if you'd like additional information.
>
> Thanks.
>
> ████

EXHIBIT J



--
**Aneita Williams | Title IX Sports Compliance Coordinator**
**Office of Student Protections & Title IX**
**Chicago Public Schools | Near West Office**
**110 N. Paulina Street**
**Chicago, IL 60612**
**Direct: (773) 535-4402, ext. 54402 | Office: (773) 535-4400**
amwiIliams65@cps.edu
OSP Website | https://cps.edu/Pages/NonDiscrimination.aspx

https://www.credential.net/eecf5220-9994-4303-b018-cc6ee59af418

*Confidential – This document and the attachments hereto contain confidential work product and/or preliminary drafts, notes, recommendations, memoranda and other records in which opinions are expressed, or policies, observations, recommendations, actions are formulated and is intended for internal use, analysis, decision making, and administrative action only.  The contents of this document and its attachments should not be disseminated without prior approval from the Chicago Public Schools.*

**From:** ████████████████████████

**Date:** January 29, 2020 at 5:24:46 PM CST
**To:** ceo-jackson@cps.edu
**Subject: Lincoln Park and** ████████████████

Dr. Jackson,

Hello, I'm ██████████████████████████ at Lincoln Park. I was one of the parents that reported and incident at the top of the New Year. I have thought long and hard about contacting you, but I feel I must. My son and I was outed to Lincoln Park coaches and teammates by Donovan Robinson (current interim Head coach) a dean at Michell Clark High school. This led to my son being threaten and intimated by adults and children. I am beyond upset at the behavior of adults representing CPS. My son stepped up and told me about the possible sexual abuse of a young black girl. ████████ was sent a video of the incident via Snap Chat and because I reported it like some other responsible adults did, ████████ has been ostracized, threatened and alienated from the team. This cannot be how we treat children who do the right thing, is it? As a result my son is depressed and I am forced to withdraw him immediately and send him away to finish high school. I am the custodial parent of my 2 sons and now I must give him up due to lack of protection from CPS. I am not blaming you, I don't even know if you had been made aware of the incidents at Lincoln Park. Not one student has been suspended for the threats, it appears some people value winning more than accountability, structure, and discipline. This was a teachable moment for young men and we missed it. The way women (especially women of color) are treated socially is horrible and there is very limited protection from men. I MUST raise a man that understands its ok to stand against rape culture and the mistreatment of women. This culture will never change if we attack the person that stands up for women in the middle of the misogynistic and toxic male environments. There is no way Lincoln Park athletics dept. should have been able to parade young ladies around in heels, tight crop top t-shirts and jeans as mangers of the basketball games. It over sexualizes the girls in a dynamic that can be difficult to manage given teenage boys and perverted men. Please allow me to be clear..... I don't think a woman clothes dictate, or ok inappropriate treatment from men, however this is an educational institution. There must be standards.

What I think should have happened: (my opinion)

- Immediate suspension of students involved in sexual related incidents.
- Any adult/coach that knew and did not report should be terminated. Coaching staff should be removed as well. 0 tolerance
- any coach using social media to intimidate kids from speaking up should be removed immediately.
- alleged victims should be isolated before coaches/people can encourage them not to speak about the incident. (this happened)
- Any threats made to a student that reports an incident will be met with immediate suspension.

EXHIBIT K

- CPS has a long list of coaching candidates that never get opportunities, CPS should be able to remove a staff and replace them with an already vetted group if institutional control is lost.
- unsanctioned trips out of town without approval should result in loss of staff and AD
- CPS should not charge parents $250 per student athlete to participate in sports and state the monies are for transportation and then require parents to drive students to games. This should result in removal of staff if CPS did not sanction the fee of $250 that every parent paid on all levels.

While typing this letter it was deemed by the OSP that the text messages I sent of my son being threatened were "general in nature" so OSP can't do anything to help. CPS appears to be chalking this up as just a bad experience for my child. THIS is why no one will ever speak up. THIS is why kids get hurt and there is retaliation. When given an opportunity to set a tone we miss it. All I want is a letter saying my son is in good standing so I can put him another school. It appears having standards as a parent is not desired by CPS. This makes me incredibly sad Dr. Jackson.



**From:** Thompson, Brian <bkthompson2@cps.edu>
**Sent:** Thursday, January 30, 2020 3:47 PM
**To:** ██████████████████████████████████
**Subject:** Meeting Follow Up

Mr.██████████████

Thank you for taking the time to meet with us this afternoon. We know that whenever parents are coming to meet with us the conversations are not easy to have. We appreciate the two of you coming in to have the conversation and advocating for your children. Our office has been charged with addressing all allegations of sexual misconduct, which includes retaliation after making a report. We have opened an investigation into the allegations you've brought forward, which is being recorded under OSP 19/20-01625. The official complaint received notification is attached to this correspondence.

Most importantly, we are in place to ensure the safety and support of each CPS student involved in an allegation presented to our office. As we discussed, we want to move forward in understanding the concerns and experiences of your students and implementing safety and support measures. These measures will be implemented whether your students choose to remain at Lincoln Park, or together, you decide a safety transfer is needed. You can find a list of schools in Network 14 here: Schools by Network. The Network administration is aware and ready to support should either of you seek a safety transfer. You can also explore more school information here: School Profiles.

I will be your primary contact throughout this case and will be here to support all of our next steps. I look forward to speaking with both of you, and your sons, soon. At any point, please do not hesitate to reach out to me with any concerns or questions.

Best,
--

**Brian K. Thompson Jr., LCSW**
Lead Title IX Field Specialist
Office of Student Protections & Title IX
110 N. Paulina Chicago, IL 60622
773-535-4370 (Direct) | 773-535-4400 (OSP Mainline)
773-553-3335 Student Safety Center (operates 24/7)
bkthompson2@cps.edu

EXHIBIT L

OSP Procedure Manual
CPS's Non-discrimination policy

EXHIBIT L

**Chicago Public Schools** | OFFICE OF STUDENT PROTECTIONS AND TITLE IX

Dear Parent/Guardian,

At Chicago Public Schools, we value student safety and an environment where all students can succeed. For this reason, we are writing to inform you that we have received allegations of **retaliation** involving your student. We take all allegations of this nature seriously and have made entities outside of Chicago Public Schools, if required.

Our office will be investigating the matter in accordance with Board of Education policies and speaking to parties involved. You will receive an update on their investigation when completed. The school must protect the privacy of all students involved, and therefore, while you will receive information about your student, the information you receive about other students will be limited.

The clinical staff at your student's school has been made of aware of the situation and will be evaluating what support services may be needed. Support, such as a safety or support plan for students involved, social work or counseling sessions, and/or changes to their daily schedule are available to your student. If there is additional support or guidance you believe your student to need, please do not hesitate to reach out.

There are also a number of resources in Chicago that can provide confidential support and advocacy for you or your student if needed. A list of available resources is attached to this letter. Our office is here to help connect you with outside resources and information if needed. We can be reached at (773) 535-4400.

Please feel free to contact us at any time with any questions or concerns.

Sincerely,

The Office of Student Protections & Title IX

EXHIBIT L - part 2

**OFFICE OF
STUDENT PROTECTIONS
AND TITLE IX**

| Resources | | |
|---|---|---|
| Important Phone Numbers:<br>**Chicago Rape Crisis Hotline**: 880-293-2080<br>**Domestic Violence Helpline**: 877-863-6338 (877-TO END DV)<br>**Illinois Department of Children and Family Services** (IDCFS): 800-252-2783 (800-25ABUSE)<br>**Office of Student Protections & Title IX**: 773-535-4400 | | |
| **Chicago Children's Advocacy Center** | Counseling, advocacy, case management and referral linkages for child survivors of sexual abuse. Provide services addressing problematic sexual behavior for youth 12 and under. | 312-492-3700<br>http://www.chicagocac.org/ |
| **YWCA of Metropolitan Chicago** | Sexual violence support services, including counseling, case management, and advocacy, including for non- offending family members, as well as prevention education at multiple locations. | 312-372-6600<br>https://ywcachicago.org/ |
| **Resilience**<br>(formerly Rape Victim Adovactes) | Free trauma therapy, medical, and legal advocacy related to sexual violence at multiple locations. | 312-443-9603<br>https://www.ourresilience.org/ |
| **Mujeres Latinas En Acción** | Free bilingual/bicultural individual counseling and therapy for domestic and sexual violence | 773-890-7676<br>https://mujereslatinasenaccion.org/ |
| **Youth Outreach Services** | Behavioral health counseling and support services for youth and families, including for problematic sexual behavior. Multiple Chicago area locations and in home services | 773-777-7112<br>https://www.yos.org/ |
| **Between Friends** | Domestic violence multilingual counseling and support services, teen relationship education, and court advocacy. Confidential location | 800-603-4357<br>https://www.betweenfriendschicago.o rg/ |
| **Garfield Park Behavioral Hospital** | Behavioral health and psychiatric support to children and teens ages 3 to 17, including for problematic sexual behavior. | 773-265-3700<br>https://garfieldparkhospital.com/ |
| **Apna Ghar** | Sexual and domestic violence services focused on crisis | 773-334-4663 |

**Chicago Public Schools** — OFFICE OF STUDENT PROTECTIONS AND TITLE IX

| | | |
|---|---|---|
| | response, counseling, and advocacy for immigrants. Uptown and Skokie | http://www.apnaghar.org/ |
| **KAN-WIN** (formerly Korean American Women in Need) | Provides domestic and sexual violence support and advocacy focused on Asian American survivors. Confidential location. | 773-583-0880 http://www.kanwin.org/ |
| **Broadway Youth Center** | A safe haven for LGBTQ youth. Health clinic, drop-in services, counseling and resource advocacy. Uptown | 773-388-1600 https://howardbrown.org/service/broadway-youth-center/ |
| **Life Span** | Specializes in court advocacy for orders of protection and other civil legal remedies, as well as counseling for domestic and sexual violence. Loop. | 312-408-1210 https://life-span.org/ |
| **A Long Walk Home** | Uses art to engage and empower adolescent girls around their experiences of violence in a variety of school-based programs. | 877-571-1751 http://www.alongwalkhome.org/ |
| **Illinois Safe Schools Alliance** | Promotes healthy development for LGBTQ youth in IL schools through advocacy, education and youth organizing. | 312-629-2988 https://www.ilsafeschools.org/ |
| **Illinois Caucus for Adolescent Health** | Engages youth and communities through peer education around sexual health and reproductive justice. | 312-427-4460 https://www.icah.org/ |
| **Chicago Alliance Against Sexual Exploitation** | Individualized legal advice, consultation, and representation following and related to sexual assault | 773-244-2230 http://caase.org/ |



**Laura LeMone, EdD**
**Network 14**
lalemone@cps.edu
773-535-8190
West Loop Office - 110 North Paulina St. Chicago, Illinois 60612

June 23, 2020

Dear Lincoln Park Parents and Families,

I hope this email finds you and your loved ones healthy and safe. I am writing today to update you on investigations involving coaches from the Lincoln Park athletics program who were removed from the school in January and February due to allegations of misconduct.

The Office of Student Protections and Title IX and the Office of Inspector General substantiated multiple allegations of serious misconduct at Lincoln Park High School. Based on these findings, the district has decided to file dismissal charges and move forward with a termination hearing for Pat Gordon (school security officer). In addition, the district has revised its discipline recommendation for Donovan Robinson (community relations representative at another CPS high school) and Larry Washington (day-to-day citywide substitute). While misconduct was substantiated, the district determined that it is appropriate for Mr. Robinson and Mr. Washington to return to their respective instructional positions. To ensure understanding of district policies moving forward, Mr. Robinson and Mr. Washington will receive training and support from the Network and the CPS Office of Student Protections and Title IX.

Nothing is more important to us than the safety and well-being of your children. We take all allegations extremely seriously, and these investigations were necessary to ensure that your child's safety will continue to be appropriately safeguarded. With these investigations behind us, I am confident that Lincoln Park will be a stronger and safer school community.

If you have questions, please feel free to contact me at lalemone@cps.edu.

Sincerely,

Laura LeMone
Chief of Network 14
Chicago Public Schools

EXHIBIT M



Begin forwarded message:

**From:** LINCOLN PARK HIGH SCHOOL <noreply@cps.edu>
**Date:** February 14, 2020 at 5:28:21 PM CST
**To:** ████████████████████
**Subject: New information about the allegations against former LPHS administrators**
**Reply-To:** noreply@cps.edu

A message from LINCOLN PARK HIGH SCHOOL

Dear Lincoln Park HS Students, Families, and Staff,

Earlier this week, along with district leaders, I sat down with members of your local school council and briefed them on the details of several active investigations happening at LPHS. The investigations remain open, and our investigators continue to evaluate additional allegations involving student and staff misconduct that have surfaced recently. While we were limited by our obligation to protect student privacy, the information we shared covered adult misconduct during the 2019-20 school year that has been fully substantiated.

Based on extensive interviews with students, staff, and parents, the district determined that school administrators fostered a dangerous culture for students by disregarding their training and requirements for protecting students and failed to effectively oversee the school's athletic program. Most troublingly, when speaking with investigators, the administrators attempted to minimize the severity of the allegations, and withheld key evidence for nearly a week. An administrator also misled parents of the whistleblowers and falsely claimed that OSP and district officials had reviewed their child's allegations and considered it not troubling. Their mishandling of the situation and lack of candor jeopardized student safety, especially the students who came forward to report the allegations, and further traumatized student survivors.

Protecting students is our highest priority, and we take allegations of misconduct seriously. Our investigation team is led by trained professionals with years of experience handling victim sensitive, trauma informed sexual abuse investigations, and their integrity is unquestioned by experts in the field. In order to successfully build a safe and supportive culture for students who come forward with allegations, students must believe that we will handle their allegation with the utmost care and respect and most importantly, protect them from further harm.

Last night, we were made aware of LPHS's LSC desire to hire an investigator to conduct their own investigation, which is well outside of their role as defined by state law. The LSC does not have the

EXHIBIT N

authority to hire their own investigators nor to investigate misconduct, but most importantly, an additional, superfluous investigation would greatly risk retraumatization of the multiple student survivors. Investigators hired by the LSC will be legally prohibited from accessing student records, entering CPS property, or interviewing students and staff. We will not allow additional harm to be done to LPHS students.

I know the events of the past few weeks have been difficult, and the district does not take the removal of school leaders lightly. However, after the series of allegations that our investigators substantiated, we acted swiftly to ensure the immediate safety of our students. We recognize your community needs significant support during this difficult time, and the district is committed to helping LPHS heal and our SEL and OSP staff are always available if you ever need someone to talk to. I'm committed to working with LPHS to find a productive path forward that supports students, families, and staff.

LaTanya D. McDade
Chief Education Officer
Chicago Public Schools

-----------

Estimados estudiantes, familias y personal de la Escuela Secundaria Lincoln Park:
A principios de esta semana, con los líderes del distrito, conversé con los miembros del consejo escolar local (LSC, por sus siglas en inglés), y les informé sobre los detalles de varias investigaciones activas que se están llevando a cabo en la Escuela Secundaria Lincoln Park (LPHS, por sus siglas en inglés). Las investigaciones siguen abiertas, y nuestros investigadores continúan evaluando otras acusaciones de mala conducta de estudiantes y del personal que han surgido recientemente. Aunque estábamos limitados por nuestra obligación de proteger la privacidad de los estudiantes, la información que compartimos abarcaba la mala conducta de los adultos durante el año escolar 2019-20, que ha sido totalmente corroborada.

Basándose en extensas entrevistas con los estudiantes, el personal y los padres, el distrito determinó que los administradores escolares fomentaron una cultura peligrosa para los estudiantes al ignorar su capacitación y los requisitos para proteger a los estudiantes, y que no supervisaron eficazmente el programa atlético de la escuela. Lo más preocupante fue que, cuando hablaron con los investigadores, los administradores intentaron reducir la gravedad de las acusaciones, y retuvieron pruebas clave por casi una semana. Un administrador también engañó a los padres sobre los denunciantes, y declaró falsamente que la Oficina de Protección Estudiantil (OSP, por sus siglas en inglés) y los funcionarios del distrito habían revisado las acusaciones de su hijo y habían considerado que no eran preocupantes. El mal manejo de la situación y la falta de franqueza pusieron en peligro la seguridad de los estudiantes, especialmente la de los estudiantes que se presentaron para denunciar las acusaciones, y traumatizaron aún más a los estudiantes sobrevivientes.

Proteger a los estudiantes es nuestra máxima prioridad, y tomamos seriamente las acusaciones de mala conducta. Nuestro equipo de investigación está dirigido por profesionales capacitados con años de experiencia en el manejo de investigaciones de abuso sexual, que son sensibles y traumáticas para las víctimas. Por lo tanto, la integridad de estos profesionales resulta incuestionable para los expertos en el ámbito. A fin de crear exitosamente una cultura segura y acogedora para los estudiantes que presentan denuncias, los estudiantes deben confiar en que manejaremos sus acusaciones con el mayor cuidado y respeto y, sobre todo, en que los protegeremos de mayores daños.

Anoche, nos enteramos de que el LSC de la LPHS deseaba contratar a un investigador para llevar a cabo su propia investigación, lo cual solo es aceptable cuando esto se hace fuera de su función, como lo define la ley estatal. El LSC no tiene la autoridad para contratar a sus propios investigadores ni para investigar la mala conducta. Pero lo más importante es que una investigación adicional e innecesaria aumentaría la posibilidad de que algunos de los estudiantes sobrevivientes se vuelvan a traumatizar. Si el LSC decide proceder, se les prohibirán legalmente a sus investigadores a que accedan a los registros estudiantiles, a que ingresen a la propiedad de la CPS, o a que entrevisten a los estudiantes y al personal. No permitiremos que se cause un daño adicional a los estudiantes de la LPHS.

Estoy consciente de que los eventos de las últimas semanas han sido difíciles, y el distrito no toma a la ligera el despido de los líderes escolares. Sin embargo, después de la serie de acusaciones que

**EXHIBIT N**

nuestros investigadores corroboraron, actuamos rápidamente para asegurar la seguridad inmediata de nuestros estudiantes. Reconocemos que su comunidad necesita recibir apoyo significativo durante este difícil momento, y el distrito está comprometido a ayudar a la LPHS a superar los eventos de las últimas semanas.


LaTanya D. McDade
Directora de Educación
Escuelas Públicas de Chicago

EXHIBIT N



Office of Student Protections and Title IX
110 North Paulina Street - Chicago, Illinois 60612
Telephone: (773) 535-4400 |Email: ospinvestigations@cps.edu
Camie C. Pratt JD | Chief Title IX Officer

**CONFIDENTIAL**

February 7, 2020

RE: ███████████

Dear ████████████████████

This letter is to update you on the outcome of the investigation into the allegation of Retaliation SCC 5-4  we received involving your student.  The Office of Student Protections and Title IX conducted an investigation according to the Chicago Board of Education's policies and have determined that the allegations are **substantiated.**

Regardless of the outcome, please know that your school's administration and clinical staff are available for your student. Support, such as a safety or support plan for students involved, social work or counseling sessions, and/or changes to their daily schedule remain available to your child. In addition, the Office of Student Protections and Title IX (773-535-4400) is here to help connect you with outside resources and information if needed. Finally, a list of community resources available to you is attached to this letter.

If you have concerns or questions about the outcome of this investigation, please contact the Office of Student Protections and Title IX (773-553-4400) and consult the guidelines for appeal on the following page.

Sincerely,

X. Rojas

Xochilt Rojas

Title IX Investigator

Parent Signature: _____

EXHIBIT O

**OSP Appeal Process for OSP-Led Investigations**

**Making an Appeal Request:** Any party who is not satisfied with the outcome of an OSP-led investigation may appeal to the Title IX Officer through a written request, within 15 calendar days of receiving an investigative outcome notification letter. The written request should include information to identify the incident in question, any new information not available at the time of the investigation, and state the reason for disagreement. Any party may submit their request in person or by mail to the office address listed below, or they may submit their request via e-mail to ospappeals@cps.edu with the subject line of "OSP Appeal for [Student Name - DOB: XX/XX/19XX]."

- Title IX Officer
  Office of Student Protections and Title IX
  110 N. Paulina, Chicago, IL 60612
  Phone: 773-535-4400
  E-Mail: ospappeals@cps.edu

**Understanding the Appeal Review Process:** In considering an appeal, the Title IX Officer shall review the following factors:
- Whether any factual errors were made in the school-based investigation.
- Whether the documentation of the investigation was correctly interpreted and supports the outcome.
- Whether any new information not available at the time of the investigation changes the outcome.

**Receiving a Decision on your Appeal:** The Title IX Officer shall render a determination within 15 school days of receiving the written request for appeal. The Title IX Officer shall notify the party requesting the appeal of the decision and shall document that notification in OSP records.

**Appealing Related Disciplinary Consequences:** Please note that the Title IX Officer is only reviewing the outcome of an OSP-led investigation and not the related discipline consequences since they are not issued by the Office of Student Protections and Title IX. Any party may choose to appeal a disciplinary consequence if they disagree with the degree of the disciplinary measure or the disciplinary measure itself by contacting Network Chiefs and/or Student Adjudication in this manner:
- Appeals for discipline consequences involving suspensions should be submitted to Network Chiefs.
- Appeals for discipline consequences involving expulsions should be submitted to Student Adjudication.

EXHIBIT O

# Chicago Public Schools Policy Manual

| | |
|---|---|
| **Title:** | **ANTI-BULLYING** |
| **Section:** | **705.5A** |
| **Board Report:** | 19-0626-PO4          **Date Adopted: June 26, 2019** |

**Policy:**

### ANTI-BULLYING POLICY

**Purpose**

The Illinois General Assembly has found that a safe and civil school environment is necessary for students to learn and achieve and that bullying causes physical, psychological, and emotional harm to students and interferes with their ability to learn and participate in school activities. Bullying has been linked to other forms of antisocial behavior, such as vandalism, shoplifting, skipping and dropping out of school, fighting, using drugs and alcohol, sexual harassment, and violence. It is the goal of the Chicago Board of Education ("Board") to create a learning environment in all its school communities where all students feel safe and supported, are protected from bullying, and are able to succeed academically and develop socially and emotionally into responsible, caring individuals.

The Board asks every Chicago Public School ("CPS") student, with the support of his/her parent(s), guardian(s) and the adults at school, to commit to the following principles, which will apply to everyone on school property and at school-related activities:
- I will not bully others.
- I will try to help anyone I suspect is being bullied.
- I will work to include students who are left out.
- If someone is being bullied, I will tell an adult at school and an adult at home.

**Scope**

Bullying is contrary to Illinois law and this Policy is consistent with the Illinois School Code. This Policy protects CPS students against bullying and harassment on the basis of actual or perceived race or ethnicity, color, religion, sex, national origin or immigration status, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, gender or sex (includes gender identity, gender expression, pregnancy, childbirth, breastfeeding, and pregnancy related medical conditions), genetic information, unfavorable discharge from military service, political belief or affiliation, or on the basis of a person's association with a person or group with one or more of the aforementioned actual or perceived characteristics, or any other distinguishing characteristic. The Board recognizes the particular vulnerability of students with actual or perceived disabilities and those who identify as or are perceived to be lesbian, gay, bisexual or transgender. Nothing in this Policy is intended to infringe upon any expression protected by the First Amendment to the United States Constitution or Section 3 of Article I of the Illinois Constitution.

This Policy is based on the engagement of a range of school stakeholders, including students and parents/guardians. The Board or its designee will re-evaluate this Policy every two (2) years based on an assessment of its outcomes and effectiveness, including, but not limited to, factors such as the frequency of victimization; student, staff and family observations of safety at school; identification of areas of a school where bullying occurs; the types of bullying utilized; and bystander intervention or participation. The information developed will be made available on the District's website.

Bullying and harassment are prohibited:
(1) during any school-sponsored or school-sanctioned program or activity;
(2) in school, on school property, on school buses or other Board-provided transportation, and at designated locations for students to wait for buses and other Board-provided transportation ("bus stops");
(3) through the transmission of information from a CPS computer or computer network, or other electronic school equipment;

22

EXHIBIT P

(4) when communicated through any electronic technology or personal electronic device while on school property, on school buses or other Board-provided transportation, at bus stops, and at school-sponsored or school-sanctioned events or activities;
(5) when it is conveyed that a threat will be carried out in a school setting, including threats made outside school hours with intent to carry them out during any school-related or sponsored program or activity or on Board-provided transportation;
(6) when it is a Student Code of Conduct ("SCC") Group 5 or 6 behavior that occurs off campus but most seriously disrupts any student's education.

### Definitions

**"Bullying"** means any physical or verbal act or conduct, including communications made in writing or electronically, directed toward a student or students, and meets all of the following criteria:

(1)   An observed or perceived imbalance of power exists between the person(s) engaging in the bullying behavior(s) and the targeted student(s); and/or student(s) were targeted based on prejudice or bias (as defined below).
(2)   The behaviors are severe or pervasive (repeated over time), or there is a high likelihood that behaviors will be repeated.  While bullying is often characterized by repeated acts, sometimes a single incident constitutes bullying depending on the severity and if other elements of bullying are present.
(3)   The intent of the person(s) engaging in the behavior is to cause physical or emotional harm to the targeted student(s).
(4)   The behavior has or can be reasonably predicted to have one or more of the following effects:
      (a) placing the student in reasonable fear of harm to the student's person or property;
      (b) causing a substantially detrimental effect on the student's physical or mental health;
      (c) substantially interfering with the student's academic performance; or
      (d) substantially interfering with the student's ability to participate in or benefit from the services, activities, or privileges provided by a school.

Bullying may take various forms, including without limitation, one or more of the following: harassment, threats, intimidation, stalking, physical violence, sexual harassment, sexual violence, theft, public humiliation, destruction of property, or retaliation for asserting or alleging an act of bullying.  This list is meant to be illustrative and non-exhaustive.

"**Cyberbullying**" means using information and communication technologies to bully.  This definition includes cyberbullying by means of technology that is not owned, leased, or used by the school district when an administrator or teacher receives a report that bullying through this means has occurred.  This Policy does not require a district or school to staff or monitor any nonschool-related activity, function, or program.

**"Retaliation"** means any form of intimidation, reprisal including but not limited to the submission of knowingly false bullying allegations, or harassment directed against a student who reports bullying, provides information during an investigation, or witnesses or has reliable information about bullying.  Retaliation is prohibited and will result in the imposition of appropriate interventions/consequences according to this Policy and the SCC.

**"Peer Conflict"** means disagreements and oppositional interactions that are situational, immediate and developmentally appropriate.  Conflicts arise when two or more students with relatively similar observed or perceived power have differences in opinion or perspectives. When school employees are aware of peer conflict, they are expected to guide students in developing new skills in social competency, learning personal boundaries and peaceably resolving conflict, and to model appropriate social interactions.

**"Prejudice or bias"** means motivation for bullying or harassment based in part or in whole by actual or perceived race, color, religion, sex, national origin or immigration status, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, gender-related identity or expression, unfavorable discharge from military service, association with a person or group with one or more of the aforementioned actual or perceived characteristics, or any other distinguishing characteristic.

23

EXHIBIT P

**"Restorative Practices"** means a continuum of school-based alternatives to exclusionary discipline that are adapted to the particular needs of the school and community, contribute to maintaining school safety, protect the integrity of a positive and productive learning climate, teach students the personal and interpersonal skills they will need to be successful in school and society, serve to build and restore relationships among students, families, schools, and communities, and reduce the likelihood of future disruption by balancing accountability with an understanding of students' behavioral health needs. Restorative practices are ways of pro-actively developing relationships and community, as well as repairing community when harm is done. After conflict or harm, Restorative Practices provide a way of thinking about, talking about, and responding to issues and problems by involving all participants to discuss their feelings and opinions, identify what happened, describe how it affected everyone, and find solutions to make things better.

## Preventing Bullying

All CPS principals and staff shall work to develop safe, supportive school environments that prevent bullying through:

- **Developing supportive school climate strategies**, including clear expectations and share agreements to guide interactions between students, and between staff and students.
- **Teaching all students social and emotional skills** and establish classroom and school-wide practices that promote relationship-building, including teaching all school stakeholders to speak out when they see or hear bullying, degrading language, and bias or prejudice.
- Establish predictable responses and **effective disciplinary practices** that address root cause, teach skills, build empathy, and repair harm. Ensure all students, staff, and stakeholders know how your school plan to respond to bullying and harassment.

**Intervening to Address Bullying**

A. Responsibilities of CPS Employees and Contractors

All CPS employees and contractors, including security officers, lunchroom staff and bus drivers, who witness incidents of bullying or school violence or who possess reliable information that would lead a reasonable person to suspect that a person is a target of bullying, must:

(1) intervene immediately in a manner that is appropriate to the context and ensures the safety of all people involved;

(2) report the incident of bullying or retaliation to the Principal/Designee as soon as practicable, but within 24 hours, on the CPS Bullying Complaint Form (Attachment A); and

(3) cooperate fully in any investigation of the incident and in implementing any safety plan established by the Principal/Designee.

B. Responsibilities of Students, Parents and Guardians

No student who witnesses bullying may stand by or participate in the bullying, but must notify an adult at school and an adult at home as quickly as practicable. Any parent or guardian who witnesses or is notified of bullying has an obligation to advise the Principal/Designee as quickly as practicable. Reports can be made to any CPS employee or contractor in person, by completing Attachment A and submitting it to the Principal/Designee, by calling the CPS Parent Support Center at (773) 553-3772, or by emailing BullyingReport@cps.edu. Anonymous reports will be accepted by the Principal/Designee. No disciplinary action will be taken on the sole basis of an anonymous report.

C. Steps for Investigating Bullying Reports

(1) **Ensure safety.** The Principal or his/her designee will provide immediate support to any targeted student(s) to ensure safety. If there are overt or implied risks of safety, follow the steps in the CPS Crisis Manual, including immediately notifying the CPS Student Safety Center and the school's Network office. Alleged behaviors targeted at sex, gender, sexual orientation, gender identity, or gender expression should be reported immediately to the Office of Student Protections and Title IX for assistance and support at the OSP Hotline: (773) 535-4400.

EXHIBIT P

(2) **Notify parents/guardians of all involved students.** Within one school day of receipt of a bullying report, the Principal/Designee shall report to the parent/legal guardian of all involved students, via telephone, personal conference and/or in writing, the occurrence of any alleged incident of bullying, and shall document these notifications in the District student information system.
   a. Notifications should be made privately to students directly involved and their parent/legal guardians.
   b. Additionally, when incidents have a larger impact on the school community, the Principal/Designee shall provide clear communication to students, staff and parents to re-inforce school-wide expectations and a climate of respect and inclusion.

(3) **Document all allegations of bullying.** Within two school days of receiving a report of bullying, the Principal/Designee will document the allegation in the District student information system as a general incident report and document all notifications made.

(4) **Conduct an investigation.** The Principal and/or a designee, who is knowledgeable about bullying prevention and intervention, shall perform the investigation. For guidance, contact the Law Department at (773)553-1700.

   Investigation of reported bullying shall be initiated within 5 school days of receipt of a report, documented within the incident report in the District student information system, and completed within 10 school days, unless the Principal grants in writing an additional 5-day extension due to extenuating circumstances. The Principal/Designee shall document the extension in the investigation report and shall notify the parties involved.

   The investigation shall include:
   a. Identifying all involved parties, including the student(s) alleged to have engaged in the bullying behaviors, alleged target(s) and bystander(s), as well as any adult who witnessed the incident or may have reliable information about it.
   b. Conducting an individual interview in a private setting with all involved parties. The alleged target should never be interviewed in public or with the student(s) alleged to have engaged in bullying.
   c. Determining how often the conduct occurred, any past incident or continuing pattern of behavior, and the District student information system of the behaviors on the targeted student's education.
   d. Assessing the individual and school-wide effects of the incident relating to safety.

(5) **Make a determination whether allegations of bullying are substantiated or not and document determination.** The Principal/Designee shall consider whether the four elements of the bullying definition are met, or if all four elements of bullying are not present, whether the behavior qualifies as another inappropriate behavior listed in the SCC. When the investigation is complete, the Principal/Designee shall ensure the investigation and findings (whether the report of bullying is substantiated or not substantiated) are documented in the District student information system. If the investigation determines a student engaged in bullying behaviors and/or other inappropriate behaviors listed in the SCC, the Principal/Designee shall prepare a Misconduct Report.

(6) **Notify all involved parties of the outcome of the investigation.** Within one day of making a determination, the Principal/Designee shall notify, in writing, the parents/legal guardians of all students involved of the outcome of the investigation. Parents/legal guardians of the students who are parties to the investigation may request a personal conference with the Principal/Designee to discuss the investigation, the findings of the investigation, the actions taken to address the reported incident of bullying, and any resources available in or outside the school to help the students address the underlying reasons for the bullying.

When communicating incidents of bullying to the targeted student's parent/guardian, the Principal/Designee should consider whether the student may want to keep certain information confidential. For example, if a student is bullied after coming out as gay, the Principal/Designee shall not disclose the student's sexual orientation to the parent/guardian without the student's permission, unless there is a legitimate, school-related reason for doing so.

25

EXHIBIT P

If the investigation determines a student engaged in bullying behaviors, the Principal/Designee shall provide the Misconduct Report to the parent/legal guardians of the student who engaged in the behaviors. The Principal/Designee may advise the parent/legal guardian of other involved students that the Student Code of Conduct was followed. S/he may not advise them of specific consequences imposed, as that would violate the confidentiality of school-record information required by law.

D. Determining an Appropriate Response

The goal of the response is to ensure the targeted student feels safe and welcome, and the student engaging in bullying behaviors understands the harm s/he caused and changes his/her behavior. For guidance in determining an appropriate response, contact the Office of Social & Emotional Learning at (773) 553-1830, or see cps.edu/SEL.

(1) **Identify school risk factors and ensure a universal strategy for school climate improvement and social and emotional development.** Assess and address any issues in supervision, expectations, relationship-building, and emotional learning.

(2) **Support the targeted student.** Assign school staff to create and implement a plan that will restore a sense of safety for the targeted student and other students who have been impacted. Determine any other interventions that may be appropriate.

If the targeted student has a disability, the school shall convene the IEP Team to determine whether additional or different special education or related services are needed to address the student's individual needs and revise the IEP accordingly. For example, if the student's disability affects social skill development or makes the student vulnerable to bullying, the Principal/Designee shall ask the student's IEP Team to consider whether the IEP should include provisions to reduce vulnerability to bullying.

(3) **Determine interventions and/or consequences that address the root cause of the students' bullying behaviors.** Consider the nature of the behavior, the developmental age of the student, and the student's history of problem behaviors and performance. Follow the Student Code of Conduct and the *Guidelines for Effective Discipline*, and identify opportunities to teach, build empathy, and repair harm. While suspensions may be necessary in some cases to ensure the safety of the targeted student, keep in mind that suspending or expelling students who bully does not reduce bullying behavior.

If the student who engaged in bullying behavior is a student with a disability, the school shall convene the IEP Team to determine if additional supports and services are needed to address the inappropriate behavior and develop the student's social and emotional skills. The team may also consider examining the environment in which the bullying occurred to determine if changes to the environment are warranted. For example, the IEP Team should consider a behavior intervention plan for the student or review a current behavior intervention plan and revise if necessary. The Principal/Designee shall comply with the Procedural Safeguards for Discipline of Students with Disabilities/Impairments when considering interventions and consequences for students with disabilities.

Contact the Office of Social & Emotional Learning for school-wide climate and skill-building practices that prevent bullying, and the CPS Law Department for more information about the appropriate and legal consequences for student misconduct.

(4) **For incidents that impact the larger school community, provide opportunities in safe, structured environments for affected students, staff, and/or parents to speak about the incident, its impact, and what is needed to repair the harm.**

E. What Not To Do:

- Solicit an apology from the student who engaged in bullying to the targeted student or mandate a public apology, use peace circles, victim/offender conferences, or any form of mediation that puts the student who engaged in bullying in contact with the targeted student in an immediate attempt to resolve the

26

EXHIBIT P

bullying. Restorative measures may be helpful to repair relationships between the student who engaged in bullying and targeted student, but only if used after other interventions have balanced the power differential between the perpetrator and target.
- Dismiss bullying as typical student behavior or assume it is not serious.

### Appeal
Any party who is not satisfied with the outcome of the investigation may appeal to the Office of Student Protections and Title IX, or OSP (telephone: 773 535-4400), within 15 calendar days of notification of the Principal's decision. OSP shall render a final determination in accordance with the timeline and procedures set out in the anti-bullying appeal guidelines established by OSP. OSP may return the incident to the Network Chief, Principal or their designees for further investigation or reconsideration of the consequence(s), direct the imposition of other consequence(s), or deny the appeal. OSP shall notify the party requesting the appeal and the Principal that its decision is final and shall document that notification in the Incident Report in the District student information system.

### Consequences for CPS Employees and Contractors
When it is determined that an employee or contractor was aware that bullying was taking place but failed to report it, the employee/contractor will be considered to have violated this Policy. The Principal shall consider employee discipline for such violations, making reference to any applicable collective bargaining agreement. Remedies for offending contractors should be imposed according to their Board contracts.

### Notice and Dissemination of Requirements
Principals shall follow the requirements established by the Office of Social & Emotional Learning for posting this Anti-Bullying Policy on the school's website, in the school building as well as disseminating and presenting this Policy to school staff as part of pre-school-year professional development.

### Training and Professional Development

Staff
Professional development will be offered to build the skills of all CPS employees, contractors and volunteers to implement this Policy. The content of such professional development shall include, but not be limited to:
(1) Developmentally appropriate strategies to prevent incidents of bullying and to intervene immediately and effectively to stop them;
(2) Information about the complex interaction and power differential that can take place between and among a perpetrator, target, and witness to the bullying;
(3) Research findings on bullying, including information about specific categories of students who have been shown to be particularly at risk, and any specific interventions that may be particularly effective for addressing bias-based bullying; and
(4) Information about Internet safety issues as they relate to cyberbullying.

Student Internet Safety Education
In accordance with the Board's Internet Safety Policy (http://policy.cps.edu/download.aspx?ID=261), each school shall incorporate into the school curriculum a component on Internet safety to be taught at least once each school year to all students. The Chief Officer of Teaching and Learning or designee, shall determine the scope and duration of this unit of instruction and topics covered. At a minimum, the unit of instruction shall address: (a) safety on the Internet; (b) appropriate behavior while online, on social networking Web sites, and in chat rooms; and (c) cyberbullying awareness and response. The age-appropriate unit of instruction may be incorporated into the current courses of study regularly taught. Schools shall satisfy the documentation requirements established by the Chief Officer of Teaching and Learning or designee to ensure compliance with this curricular requirement.

EXHIBIT P

**ATTACHMENT A**
Chicago Public Schools
Form for Reporting Bullying and Retaliation

NOTE:  The reporter may remain anonymous, but no discipline will be imposed based solely upon an anonymous report.

Please submit this report to the principal or any school staff member.  You may also call the Parent Support Center (773 553-3772) or email BullyingReport@cps.edu to make a report.

**Victim or Target Information**

School: _____

Name(s) and grade(s) of Victim/Target:
_____

_____

**Reporting Information (*Optional for students/parents/guardians)**

Name & Title of Person Reporting: _____

Relationship to Victim/Target: _____

Phone: _____  Email Address: _____

**Incident Information**

Name(s) of student(s) accused of engaging in bullying behaviors OR description (if name(s) unknown):
_____

Location of incident: _____

Date and time of incident: _____

Approximate dates, times, and frequency of prior incident(s):_____

Describe what happened and who was present in as much detail as possible (*Required Information):

_____

_____

_____

_____

Date of submission: _____

EXHIBIT P

**Amends/Rescinds:**
**Cross References:**    19-0626-PO4 (Student Code of Conduct Effective September 3, 2019)
                          18-0725-PO1 (Student Code of Conduct Effective September 4, 2018)
                          17-0628-PO1 (Student Code of Conduct Effective September 5, 2017)
                          15-0722-PO1 (Student Code of Conduct Effective September 8, 2017)
                          14-0625-PO1 (Student Code of Conduct Effective September 2, 2014)
                          13-0724-PO2 (Student Code of Conduct for the 2013-2014 School Year)
                          12-0627-PO1 (Student Code of Conduct for the 2012-2013 School Year)
**Legal References:**

EXHIBIT P